This is Inglert v. Kogan May it please the court, Kristen Santillo on behalf of Petitioner Appellant Donald Inglert. Mr. Inglert was convicted and sentenced to 22 years in prison for course of sexual conduct against a child in the first degree based on what the prosecutor argued to the jury was a case that turned on the testimony of a 12-year-old child who was the only eyewitness to the alleged sexual abuse. In the state court, Mr. Inglert, appearing pro se, submitted affidavits from experts and from lay witnesses which at minimum tended to substantiate that his trial counsel had rendered ineffective assistance of counsel. And those affidavits and his claims were not conclusively refuted by the documentary evidence. Under those facts, it was an unreasonable application of the facts and of Strickland to deny his claims without a hearing. I'd like to address both why counsel was ineffective under Strickland and also why the state court's application of the facts was unreasonable, but I'm happy to take in whatever the court would like. Can I, I didn't hear in that list, the thing I'm most interested in hearing from you about is the prejudice piece. And in particular, I'm going through the bombs, bombs affidavit, bombs? Dr. Bombs. Dr. Bombs affidavit. And I'm sort of asking myself the question, what has Dr. Bombs offered that would be pertinent on the issue of prejudice? And so maybe I'll ask you to, if that's not where you're planning to start. Absolutely. There's a number of things that I think that Dr. Bombs could have brought to the table to counter Lyons' key conclusions, which I believe were misidentified by the state court. The prosecutor is very clear that the reason that he introduced the testimony of Dr. Lyons or of nurse practitioner Lyons was to cure a hole in the prosecution's case, that there was no medical evidence of the abuse. And Lyons didn't just say that the findings in the exam were inconclusive. She said that it would be expected that they were conclusive and that the findings were consistent with 95 percent of the cases in which she examined victims of sexual abuse. And that they were consistent with an NL's account, her social history. So Bombs could have, he could have countered many of these issues. You correct me if I'm misunderstanding the record, but didn't his affidavit say that the large majority of sexually abused children don't have positive findings if they are examined, if the exam is delayed beyond the first several days? I'm trying to understand, to the extent that he's in agreement with her testimony, where would be, how would he be helpful to the defense? He said that there are some, he basically said there are some situations where lacerations can heal. But findings, and I'll read this here, he said while some hymen lacerations may heal, Lyons did not differentiate between complete lacerations of the hymen, which may not fully heal, or other deep lacerations of the posterior hymen, which may leave a cleft or a notch and not fully heal. Findings diagnostic of sexual abuse include scarring of the posterior foreshad or fossa, hymenal transaction, and missing posterior hymenal tissue, which were not observed during the examination of normal. It's very dense technical language, but he is contradicting her conclusion that in the type of abuse that this witness testified she experienced, that it would be the expected finding that there would be no medical evidence. I guess I'm, I am struggling with that a little. He gives examples of findings that would corroborate sexual abuse. But I don't understand, can you point me to where in his affidavit he says you would expect one or more of these findings? It's more likely than not that you would have one of these findings in the event of sexual abuse. I don't think that he uses the language more likely than not, but he does specifically counter her statistics that she presented that it was the expected finding that there would be no findings of abuse. The problem is that you go before the jury and the concern that arises is here's a child who says all of these things happened to her, there's no physical evidence to corroborate it. The prosecution's expert gets on and says that's not surprising. But if you had put this expert on, he would have had to agree that in many cases there are no such findings. Now you could have gotten some discussion about well, but there are findings sometimes, but the bottom line would have been he would have agreed that there are cases in which there are no such findings. Well, first of all, I don't think he ever had to put this witness on. Trial counsel was ineffective for both failing to consult with an expert in preparation for the cross-examination of the nurse. Well, but the failure to cross-examine in a case where basically the theory of the defense is can you possibly think that there wouldn't be findings? He decided to appeal to the jury's common sense, which was a decision he made after seeing the expert on the stand here. Now, you know, some people, some experts do not make a positive impression because they are so committed to their viewpoint. He could have made that decision and decided rather than put on his expert who would have agreed with her on that point that you could have no findings. He was going to characterize her as, you know, not being open-minded on this issue and then appeal to the jury common sense. Why is that ineffective assistance? There is nothing in the record to suggest that this was a strategic decision by trial counsel to make that determination. Before the lunch break. Well, we presume that these are strategic decisions under Strickland. There's a presumption that counsel is making strategic decisions, and here that would make sense because he knew he couldn't find an expert who would say absolutely there had to be physical injury. But here the record shows both that the trial counsel was not even aware that the witness was going to testify about the exam or that she was the one who conducted the exam just before she testified. He wasn't familiar with her background. He didn't make a strategic decision about what she was going to say. And the information that Mr. Englert submitted in his affidavits was that during meetings, trial counsel didn't say I've decided that I'm going to rely on common sense here. What he said was I don't have time to find another or I don't have time to find an expert and that I'm going to rely on the people's burden to prove their case. Which in his opening statement, he said I'm going to prove my client's innocence. So that is objectively unreasonable and the record does not support a finding that this was a strategic choice that was made by this witness. I think there's a couple of other things that Baum said. I just, going to your prejudice point, he said that there would have been bleeding based on the interviews he reviewed and her testimony. That would have contradicted her testimony, that she didn't recall any bleeding. So one of the things, and I was trying to, I focused on that as well. And I'm a little bit trying to figure out how that, in looking at her testimony, whether the child described a level of penetration that would be commensurate with that opinion by Dr. Baum. And maybe that's a fact question, I don't know. But certainly on the vaginal penetration, she testified that it stopped quickly. I don't think you could say that Dr. Baum's testimony is inconsistent on the vaginal side. I think on the anal side, I agree it's more, I understand that would be where you'd focus. Well, I think that the point here is that Dr. Baum's reviewed her testimony. And he reviewed the interviews that she did with social workers in advance. And he reviewed her medical exam. And he concluded in his expert opinion that there would have been bleeding if, you know, in this situation. And I have the citation where he said, since no lubricant was used in the alleged vaginal and anal acts, bleeding should have occurred because of the size of an adult erect penis as described in interviews and testimony by the child. So I think that that's an expert conclusion that Mr. Englert presented that was not conclusively refuted by the government. They didn't submit any affidavits to counter that in the state court record. So I think he would have countered, he would have countered that point and her testimony on that point, which I think would have been a key factor the jury could have considered in evaluating her credibility. And he also would have been able to explain that these factors the court tried to emphasize with late testimony, that she was a happy child, that she got straight A's in school, that she had no social problems. He could have provided the scientific bones that were necessary for the jury to process that information and weigh it in favor of Mr. Englert. So I think I'm over my time. Thank you. Good morning, Your Honors. May it please the court, James Gibbons for respondent. This case is not like Gersten. The Pavel-Gersten line of cases all involve two common elements. They all have a government expert who says that he or she saw definitive proof of abuse, which didn't happen here. And they all involve defense attorneys who were unprepared to elicit crucial exculpatory evidence, casting doubt on that definitive conclusion. Where again, counsel here actually did elicit an admission from the government expert that what she observed was equally consistent with innocence as well as guilt. Your Honors, on the prejudice point, which I believe Your Honors were very interested in, what does Balmes offer? And again, the only sentence in Balmes' affidavit that appellant, there's two really, that appellant points to in her argument is, my esteemed colleague points to in her argument, that first, studies in the literature indicate that certain findings are highly predictable, such as Tornheimen's bruising slash hematoma and pregnancy. The jury would have understood this sentence if it had been under a trial. Yes, when you find a 12-year-old who's pregnant, that demonstrates sexual abuse. But a 12-year-old a year later who isn't pregnant, who doesn't have a Tornheimen on these facts, that doesn't disprove abuse. It doesn't prove she's lying. There are a couple of nuggets that Dr. Balmes offered that arguably would have either provided helpful contra-expert testimony or would have informed the cross-examination. And counsel talked about a couple of them. And one of them was, as I read Dr. Balmes' affidavit, he says, you know, the nurse focused on, the same nurse focused on the sort of physical indicia of abuse or lack thereof. And if anything, his criticism was she didn't look hard enough. So that doesn't hurt the defendant. But I understand him to be critical that she drew a conclusion as to sort of the picture being consistent with the theory of abuse without adequately addressing the psychosocial factors that you would have expected to accompany this type of abuse for this extent of time. Why isn't that a significant value add that counsel neglected to bring to the table for the case? Because counsel actually elicited that on cross-examination. Counsel actually asked the, if I understand it, about how the victim was supposedly this happy child who was doing excellently in school. Counsel actually elicited that from the nurse practitioner on cross, over a government objection. Because how would the nurse practitioner know if this is a happy child? How would the government, but the court actually overruled that objection and the nurse practitioner testified to that. So he can't be ineffective on that basis. I'm sorry. No, Your Honor, I'm interrupting you. No, I interrupted you, but thank you. What the nurse practitioner didn't do, though, and nobody did, was step back sort of beyond what we'll call common sense and talk about what psychosocial indicia of abuse one would expect. There was a lot of focus on you wouldn't necessarily expect physical fingerprints of this abuse to endure for this period of time. But they didn't talk about the psychosocial piece. So eliciting an admission that the child was happy and well-adjusted without pairing it. I guess I'm wondering whether without pairing it with some expert testimony explaining how likely is that? Well, Your Honor, if I understand the question, Your Honor, that really goes to what Mr. Perkowski testified to. And again, this brings up the fact we're talking about an incredibly experienced defense advocate with these sorts of cases. Counsel's cross-examination of Mr. Perkowski has got multiple references to. You and I have done this cross many times before, right? And I've never grilled you. I've always been nice to you on cross-examination. Let's do it one more time. And Mr. Perkowski testified to how there's this huge variety of behaviors that child victims of sexual abuse can display. And it would be wrong and incorrect for laypeople to assume that such children are sad all the time or they cry all the time. They're always going to have this particular demeanor on the stand. And that goes to an issue that this Court did not grant a COA on. And so unless this Court really wants to get into the details, I don't want to spend too much time on it. But counsel did bring that out through cross-examination of exactly the right witness. Because the government did put out an expert on that, and counsel effectively cross-examined that witness, which is exactly what the state court found and what the district court found here. But we really come back to that there is this doubly deferential standard that appellant has to meet. I'm sorry, Your Honor. I wanted to talk to you about the double deferential standard, one the Strickland and the other the AEDPA. Yes. Now, actually, in Harrington v. Richter, the Supreme Court deals with how the failure to call expert witnesses. And in discussing the AEDPA standard says, in many instances, cross-examination will be sufficient to expose defects in an expert's presentation. So is it your position that, as a matter of course, the state court cannot have erred by relying on the cross-examination here? Or I just want to make sure I understand your position. Strickland is a fact-specific standard. It's a general rule. It is not a world of hard and fast rules. I would not ask this Court to adopt a per se rule saying cross-examination is always appropriate, any more than Gersten says cross-examination is always inadequate. Instead, what we're saying is that the state court has to make factual determinations, and that as the Supreme Court said in Burt v. Titlow, it is a strong presumption that counsel is effective. It is the habeas petitioner's burden to overcome that with proof on every element, including the reasonableness of counsel's choices. I know my esteemed colleague said, well, appellant's arguments weren't conclusively refuted. There's a reason for that, because we don't have the burden of proof. He has the burden of proof, and he had a burden of proof if he wanted an evidentiary hearing on counsel's choices. He had a couple of options. He could have sought, as the petitioner in Titlow did not do, and as the state court in Titlow faulted him for, and the Supreme Court affirmed this. He could have gotten an affidavit from trial counsel detailing the reasons for not getting the expert bombs in this case. He didn't attempt to do that. He didn't offer a reason for not doing that, and the appellate division under- But he did offer a fair amount of testimony from others by way of affidavit as to the reasons counsel expressed. Isn't that enough to at least satisfy a burden of production? So that if the theory is, no, no, this was a strategic choice that at that point faced with a bunch of affidavits saying, no, we didn't have time, we said we didn't really need to do it, that the state would need to come back and say, no, this was a strategic choice, here's an affidavit from counsel? Appellant has a burden of persuasion as well as production, Your Honor, and in fact, of those affidavits, they're in pages 303 through 310 of the record. All but one of them say the counsel consistently said that he did not need an expert because that was not his strategy, because he intended to hold the government to its burden of proof. And there was one affidavit that says during a conversation two days before trial, counsel said, well, at this stage, I don't have time to go get an expert. But that hardly demonstrates that counsel didn't have a strategy. If counsel is saying, I intend to hold the government to its burden of proof, that's a strategy. Isn't one of the lessons of Gerson that you may make an informed decision not to call an expert, but in a case like this, it would be pretty darn close to the line, if not per se a problem, not to at least consult an expert when there's testimony about the evidence of abuse of a child, let's say? That's not what Spicula says, to clarify Gerson. And this court has said in Spicula that Gerson does not create a requirement that defense attorneys in child sex abuse cases such as this must always consult with or call an expert in rebuttal. Rather, it just states that the absence of expert consultation, counsel may provide reasonable representation in the face of expert testimony by educating themselves sufficiently on the scientific issues to challenge this evidence effectively. And it really gets back to exactly your point earlier, Your Honor, is that this is a case we have, and again, this is an area where Strickland warns us that the cold record can deceive us. The cold record is going to deceive us here. It's not obvious to us, but it was obvious to counsel at the time. He had a jury of the 12 jurors. Four of them are medical professionals themselves. One of the jurors is a nurse practitioner. He cannot make an argument. I'm sorry. I'm sorry. I'm totally interrupting, but I hear where you're going. But the decision as to whether to consult an expert happens months if not years before he gets in front of a jury. So counsel doesn't know whether there will be medical professionals on the jury when he makes a decision that I'm not even going to consult with an expert to help me identify the potential weaknesses in the state's case. He knows the case is going to be in Monroe County in Rochester. The largest employer up there is going to be the University of Rochester Medical Center, which employs nearly 20,000 people in that region. He knows there's going to be medical professionals in the jury pool. He knows that this is highly likely. I'm speculating, though, because you don't have record evidence of this. We do have record evidence that there's four medical professionals on the jury. But you don't have record evidence of what counsel knew. I thought your argument, which you made early in your presentation, was that these cases are distinguishable from the Gersten line of cases because there, there was an expert who was going to say there were positive indicia of abuse that another expert might have said, no, that's not as telling as they're suggesting. Here, what counsel knew was there were no physical evidence of abuse. All their expert was able to do was say, that shouldn't surprise you. Is that right? That's exactly right, Your Honor. That there, the decision to cross-examine was not ineffective. It was not unreasonable strategy. That's exactly right, Your Honor. And the state court was entitled to make that determination, with which the district court agreed, that we just don't even have to reach the question of whether counsel's strategy was reasonable. Though it does, the record here does establish that counsel's strategy was reasonable because the affidavit here doesn't provide the sort of material that would have a reasonable probability. As Reeve said, would every fair-minded jurist say that every reasonable defense attorney would have put this expert on? I think the case in particular that the expert, the child testified to anal abuse and the expert affidavit does say that in that context, there would be more of a probability, certainly not beyond a reasonable doubt, maybe even more likely than not, but more of a probability that you would see signs of physical abuse. Right, although again, he does not dispute that the large majority of all child sex abuse victims, including anal sex abuse victims, have negative findings a year after the abuse. And in fact, the child's testimony was that the anal abuse never involved penetration. The only time there was any reference to penetration in the anal abuse was on cross-examination. Counsel asked, were you testifying that his penis went into your anus, your rectum, your anal orifice, whatever you call it. She was 12 years old. She never used any of those words in her testimony. She was very consistent. His penis was in her butt, between her butt cheeks was the language that she used. She was not testifying that there was anal penetration. As a matter of common sense, there is no reason on this record to infer either the sort of penetration that would cause bleeding, the sort of penetration that would cause any injury to the hymen, or the sort of penetration that would cause any damage to the anus, which is why Lyons testified we wouldn't expect to see physical evidence of the abuse here. And under the deferential standard for Strickland and for AEDPA, the state court's decision was not an unreasonable application of clearly established law. Can I just ask one more question? So the state court said in rejecting the claim, nowhere in Bonds' affidavit does he set forth an opinion that it would not be possible for there to be a physical exam of the victim six months to one year after the last incident of abuse and for it to show normal findings despite the years and frequency of abuse. Is that an accurate, that's an accurate description of the fact, but is that an accurate standard to hold the affidavit to in evaluating the claim for post-conviction relief? Well, the court had laid out the standard for getting an evidentiary hearing into what counsel's rationale was earlier, and it was quoting directly from the appellate division's decision on direct appeal, and that's on page 201 of the record, where it said that appellant needed to do three things to get an evidentiary hearing in state court. He needed to show the expert was available, he needed to show that the expert would have provided some testimony that would have assisted the jury, and he had to show that the jury's verdict would have been affected. And the court said in the 440 review that yes, it establishes this expert who we're going to presume was available, but this testimony really doesn't contradict Lyons' testimony. I understand your argument. I'm now asking about the reasoning of the state court. Is it true that you would have to have an expert affidavit saying it would not be possible for there to be a normal physical exam six months later, or, for example, if the expert had said it would be more likely than not that you would have evidence of physical abuse? Would that have been enough? Yes. The answer to that question is yes, Your Honor. I don't read the state court's phrasing as suggesting that a more likely than not there was no rape. I think that the state court would have granted an evidentiary hearing on that, and I think what we're focusing now on is maybe very slightly broad language that the court used in identifying an omission in appellant's proof. If it had been confronted counterfactually, if it had been confronted with the affidavit that Your Honor is composing now, he would have gotten an evidentiary hearing on that. But let me ask you, our focus is not so much on what state law would have warned, but whether there's clearly established a Supreme Court precedent that would have required it, right? Correct. And what's your position on that with respect to anything the Supreme Court has said about whether that standard the state court applied was clearly contrary to establish a Supreme Court precedent? Well, I mean, in Richter, the Supreme Court has talked about how the prejudice prong, which really that goes to, it is slightly less than a more likely than not standard, but the difference matters only in the most rarest of cases, I believe, is the Supreme Court's language. It is, for all intents and purposes, virtually identical to a more likely than not standard, and nothing in Baum's comes close, nothing in his affidavit comes close to that. With respect, I mean, the Supreme Court has not clearly spoken with respect to what you have to adduce to say that the failure to call an expert was constitutionally ineffective. I mean, indeed, when they wrote about it in Harrington, they did not address that issue, right? No, they didn't. I mean, they didn't find that counsel was ineffective. Do we have clearly established Supreme Court precedent that the state court was obliged to follow on this point? I do think that Richter does require, ultimately, the clearly established federal law is going to be Strickland, and that's really the standard, Your Honor. And that's, you know, the state court actually cited Gerstin. It cited this own court's decisions. It referred to Strickland in cases citing Strickland. The state court knew the clearly established law here, and that's very demonstrated in the record. And the state court made a reasonable determination both on the facts and on the law, and that's why Pellant fails to carry his burden. Unless there are any other questions, Your Honors, thank you very much. Thank you. Yes, Your Honor. Going to the last point, the standard that is set forth in Strickland is much lower than what the state court said in this case. He said at a preliminary stage when Mr. Engler only had to come forward with affidavits that tended to substantiate his claims, he held them to an actual innocent standard, which was essentially you have to prove that it would have been impossible for the findings on the exam to be normal if she was telling the truth. And that is inconsistent with Strickland. I think it's also inconsistent with- Can you explain that a little more? Because I'm not quite sure why the state court was required to find anything more than that. You have not shown that there was an expert who would have offered contradictory evidence. I think it is because this is not an expert. Lyons was not an expert who came forward and just said the findings were normal and they were inconclusive. She said, and the prosecutor emphasized this repeatedly in the record, he said, I'm going to present expert testimony about the rarity that there is ever going to be any medical evidence in a case like this. Right, but she's saying it's extremely rare. And he's saying that it's not quite that extremely rare. He's not saying that it's not plausible what she's saying. He's just saying it's not as extremely rare as she says it is. Well, he's saying that- I'm trying to figure out in front of a jury where that's going to get you. I don't think he's just saying that. I think he's saying she exaggerated the statistics. He's saying, and I don't think that he was just criticizing her process. I think he was criticizing how she prejudged the conclusion that there was sexual abuse. And I think that that was critical to undermining the integrity of the prosecution's case because of- But here's the question posed to the defense purported expert. But you agree, doctor, that there can be this kind of sexual abuse with no physical manifestations this many years afterwards. He's going to answer yes. That it's possible, right? But would he also be able to say that Lyons was predisposed to finding sexual abuse and that she exaggerated statistics in favor of the prosecution and that she heard a story from the victim that was inconsistent with sexual abuse from a social and emotional perspective? From a trial perspective, once he agrees with her even to that extent, it means the defense counsel no longer has that common sense argument that my colleague referred to as he was making. I don't think that anything I said would have had to be done through his testimony. I think it all could have been done in cross-examination by confronting her with the statistics that Dr. Bombs could have provided. I don't think that that's a risk that necessarily had to be taken. And I think that when you look at the way that he had to rely on common sense in front of the jury, there is no way a jury was in a position to apply common sense to what he was asking them to apply it to. I think that suggests that this trial was all about medical experts. And I'm suggesting to you that it's not. That basically the medical experts, the one that testified and the one you proposed, were going to at best be able to say, look, it's not impossible for the child who had been abused. What the focus of the trial was was on the mother's motivation to have the child make this accusation. Now, that was fully developed in front of the jury, and apparently the jury did not think that was a problem. They listened to the child, they heard about the mother's motivation, and they were not persuaded. I mean, that's the focus of this trial, not the medical evidence, because the medical evidence is, don't be surprised that there's not medical evidence. Well, so I think that that's a key thing that the state court overlooked, too, which is that when you're saying that you can overlook the failure to consult with an expert because he had such a robust strategy in developing this other case, you have to look at what he did in that other case. Englert submitted an affidavit for multiple witnesses who said he didn't meet with them to talk about the evidence until two days before trial. Englert handed him 100 pages of records, and he did nothing with them. He says in the record, during jury selection, I made a lot of copies of records and I did turn them over. I don't know if they're relevant. I don't know if they are important. I don't know if they have any basis of anything. This was the start of the trial. He tried to refer to records during testimony. The judge and the prosecutor described the records as a mess. He didn't introduce one of them. There was a dispute that was raised by the mother about whether the custody proceeding was even ongoing at the time that the disclosure was made. She said the whole custody proceeding was resolved. He didn't even address that gap in front of the jury, not once. The only ineffectiveness you're arguing is the failure to consult and call an expert. All these other things you're now arguing, this is not the basis of the ineffectiveness. But if everybody else is looking at whether he otherwise provided meaningful representation, and the counter to that is that he had this robust other strategy, we cannot ignore these failures. The theory he was supposed to be robustly pursuing, the prosecutor was able to get up in summation and say there wasn't a custody proceeding. They tried to throw these things out to you, saying these bitter custody proceedings. None of that was true. None of that is in the record. None of it's in evidence at all. And the record is clear that he didn't present a single document to support the fact that the custody was ongoing. He asked Englert about text messages. He asked him about phone records. Didn't introduce a single thing. And Englert's affidavits from his witnesses show that that was not strategic. That was because he met with him the day before and he got 100 pages of records. And the record is clear. He didn't know what they were. At one point he says, oh, I didn't know I was supposed to get certified records. And he got shut down from confronting people with witnesses. So there's ample evidence that there was inattention in this case that is not entitled to strategic deference. It didn't just extend to not even knowing who conducted the medical exam. It also extended to failing to support whether or not there was even a custody proceeding or failing to address this gaping hole in his own theory, which was that it was motivated by the custody proceeding. Because he didn't even explain to the jury why that would have been the case in the face of the testimony of the mother that it was over. Thank you. Thank you both. Well argued on both sides. And we will take the matter under advisement.